**Ramon IBARRA, Plaintiff–Appellant,**

v.

**Nancy MARTIN, Defendant–Appellee.**

**No. 96–3777.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 4, 1997.

Decided April 23, 1998.

Michael J. Foley (argued), Foley & Foley, Chicago, IL, for Plaintiff–Appellant.

Erik G. Light, Michael P. Doyle (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

For a period of time in mid–1995, Ramon Ibarra experienced difficulties with his job as a probation officer in the Cook County Department of Adult Probation ("the Department"). Accused of sexual misconduct by a coworker, he was investigated, placed on temporary suspension without pay, and, after his acquittal on criminal misdemeanor charges, reinstated with full back pay and restoration of seniority. Ibarra then sued Cook County and Nancy Martin (the Chief of the Department) under 42 U.S.C. § 1983, claiming both due process and equal protection violations. (Although Donald O'Connell, the Chief Judge of the Cook County Circuit Court and Martin's immediate supervisor, was initially listed as a defendant on this appeal, he was neither named as a party in Ibarra's complaint nor served, and thus was never properly made a defendant to the suit.) Ibarra voluntarily dismissed the County in favor of the Department (a state agency), but

eventually moved for the Department's dismissal as well. The district court granted summary judgment for Martin, the only defendant properly before it. We affirm.

## I

On Friday, June 16, 1995, Ibarra and several of his co-workers, including Catherine Rolewicz, went out for drinks after work. After several hours and two bars, the others went home; Ibarra and Rolewicz continued to drink together at a third bar. In the wee hours of the morning of June 17, they left that bar and had a sexual encounter in Rolewicz's car. Ibarra later claimed that it was consensual; Rolewicz said it was not and supported her version of events by pointing to bruises she received around her neck and chest. Ibarra dismissed these as just "hickeys."

Rolewicz promptly reported the incident on Monday morning, June 19, to Deputy Chief Probation Officer Lavone Haywood, informing him that the encounter had not been consensual. Haywood and Supervisor Val Sterling immediately discussed the matter with Ibarra. They invited him to involve his union representative, but he declined. They also gave Ibarra an opportunity to furnish his side of the story, which he did. According to Ibarra, Rolewicz had decided not to file criminal charges, and had told Haywood as much. Normally we would accept this statement, but Martin (who disputes it) points out that Ibarra admitted in his deposition that Haywood and Sterling told him that Rolewicz was planning to file charges. Ibarra also asserts, and we accept this for purposes of our review, that neither Haywood nor Sterling told him of the possible disciplinary consequences of Rolewicz's allegations.

In fact, Rolewicz did lodge a criminal complaint against Ibarra on June 19, for criminal sexual abuse. He was arrested on June 25 as a result and was promptly released on his own recognizance. The next day, Rolewicz repeated her story to the Department's Personnel Director, Bruce Wisniewski, and informed him of the criminal charges. This prompted Wisniewski to call a meeting for June 27, which was attended by Haywood,

Ibarra, and Ibarra's union representative (in addition to Wisniewski himself). Wisniewski asked Ibarra 10 to 20 questions, but on the advice of counsel Ibarra invoked his Fifth Amendment privilege not to respond. Wisniewski did not make any offer of "use immunity" to Ibarra, nor did he spell out the disciplinary consequences of Rolewicz's allegations.

Wisniewski continued to investigate the matter following the June 27 meeting. He also counseled Rolewicz about her options and transferred Ibarra to a different work location, after Rolewicz caused a brief sensation in the office when she showed her co-workers pictures of her condition following the incident. During all this time, Chief Probation Officer Martin had been on vacation. Upon her return to the office on July 7, she immediately interviewed Rolewicz and issued an order placing Ibarra on temporary suspension without pay. Martin found Rolewicz to be a credible witness, other female employees were complaining that they did not wish to work with Ibarra, and Martin viewed Ibarra as a potential threat to others. Martin also ordered Rolewicz to undergo psychological testing.

■ While the internal Departmental investigation continued, the criminal misdemeanor charge was also moving forward. Ibarra waived his right to a jury, and the trial took place on July 21. Following Rolewicz's testimony, Ibarra moved for a directed verdict and the judge found him not guilty. This, however, did not immediately result in an end to Ibarra's suspension. Instead, the Department convened a predisciplinary hearing on July 26, a step it had to take under its collective bargaining agreement if it was still considering discipline. Ibarra asserts that he had only two hours' notice of the meeting; the Department responds that it mailed notice to him on July 24. At that hearing, Department representatives informed Ibarra of the internal charges that were still pending against him (for sexual harassment and creating a hostile work environment) and the evidence on which they were based. Ibarra was given the opportunity to make a statement, which he again declined. (On appeal Ibarra cites his privilege

against compulsory self-incrimination for this refusal, but his acquittal together with the protections afforded by the Double Jeopardy Clause of the Fifth Amendment mooted his self-incrimination privilege. *See, e.g., Phelps v. U.S. Federal Government*, 15 F.3d 735, 739 (8th Cir.1994). Ibarra made no argument that he had a credible fear of federal prosecution based on the same events. *Cf., e.g., United States v. Koon*, 34 F.3d 1416, 1438 (9th Cir.1994), *rev'd in part on other grounds*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).)

In the end, the Department did not discipline Ibarra. Instead, on July 28, it extended his suspension through August 8, to allow enough time to complete the investigation. The investigating officials made a final report to Martin around July 30, and she decided that the charges against Ibarra should be dropped. The Department reinstated Ibarra on August 3, with full back pay and seniority restored. The day before, Rolewicz had left the Department's employ.

Vindication in the immediate sense did not satisfy Ibarra. Instead, he brought the present § 1983 action against Martin and her codefendants to recover the damages he suffered during his temporary suspension. He claimed that he had very little money while he was suspended, that he was unable to purchase needed medicine for his father, that his creditors hounded him, that he suffered from depression, and that he drank heavily and gained weight. He also argued that the hearings he received did not satisfy the due process clause, and that he, as an Hispanic officer, was treated less favorably than non-Hispanics, in violation of the equal protection clause.

## II

### A. Due Process

■ Ibarra's first claim is that his due process rights were violated by the defendants' failure to give him a constitutionally adequate presuspension hearing, by which he means one that satisfied the standards of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Ibarra points to a number of alleged

shortcomings: first, there was no "prompt" action, because Martin did nothing until 18 days after the incident and 17 days after the criminal charges were filed; and second, for a variety of reasons, the governmental interests at stake were insufficient to support Martin's actions. Ibarra also attacks the district court's finding that he in fact received two presuspension hearings, in the form of the June 19 and June 27 meetings. These, he alleges, fell far short of the minimum requirements under *Loudermill* and do not save the Department's action. After briefing in this case was complete, however, the Supreme Court decided *Gilbert v. Homar*, —— U.S. ——, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), which specifically addresses the question of the process due in conjunction with a public employee's suspension from work and thus governs Ibarra's case.

In *Gilbert*, the Supreme Court reiterated that the three factors identified in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), structure our due process inquiry. Those factors are (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest and the value of additional procedures in avoiding error; and (3) the government's interest. *Id.* at 335, 96 S.Ct. at 903. Looking at the first factor, the employee in *Gilbert*, Richard Homar, had made exactly the same argument Ibarra offers here, namely, that he had a significant private interest in the uninterrupted receipt of his paycheck. —— U.S. at ——, 117 S.Ct. at 1813. The Court found, however, that as long as the suspended employee receives a sufficiently prompt postsuspension hearing, this interest was relatively insubstantial. *Id.* Looking at the third factor, the Court in *Gilbert* found that the government's interest was important, because felony charges had been filed against Homar. *Id.* In Ibarra's case, the state interest may not be quite as strong, because the charges against Ibarra were limited to a misdemeanor complaint. Nonetheless, the state has a significant interest in the integrity of its probation officers. With respect to the second factor, the *Gilbert* Court noted that the very process required for the filing of these charges provided some

assurance that the suspension was justified. *Id.* at ——————, 117 S.Ct. at 1813–14.

Again, Ibarra's case is somewhat different. Perhaps most importantly, there was nothing like a grand jury proceeding to assure that the charges were supported by probable cause. We therefore look more closely at the procedures he actually received, to see if they adequately protected him against the risk of an erroneous deprivation of his interest in not being suspended from his job. (Like the Supreme Court in *Gilbert*, we assume for the sake of argument that suspension is enough to infringe a protected property interest. —— U.S. at ——, 117 S.Ct. at 1811. We also emphasize that we are evaluating only whether the procedures Ibarra received satisfied due process, not whether anything less might also have sufficed.)

In *Chaney v. Suburban Bus Division of the Regional Transportation Authority*, 52 F.3d 623 (7th Cir.1995), this court considered what procedures might be required to support a suspension. Plaintiff Chaney was a bus driver employed by Pace, the suburban authority. After the bus he was driving was involved in an accident, Chaney was suspended immediately without pay, pending the results of drug and alcohol tests. Even after those tests showed that Chaney had not been under the influence of either kind of substance, the suspension and investigation continued. *Prior* to the continued suspension, the officials notified Chaney that they were taking this action pending further inquiries into the accident. This was enough, the court found, to satisfy due process concerns at that stage:

> [W]e have little trouble concluding that due process did not mandate giving Chaney additional notice or a hearing before Pace suspended him. Chaney's interest in avoiding suspension is significant. Nonetheless, Chaney was on notice as to why he was being suspended and Pace's interest in both managerial efficiency and in public safety clearly outweigh Chaney's interest in a presuspension hearing. The Constitution does not mandate additional protection at this stage.

*Id.* at 628. See also *Gilbert*, —— U.S. at ——, 117 S.Ct. at 1814 (hearing after suspension may benefit employee, in that it would "allow[ ] officials to obtain more accurate information" and thus make a decision without "excessive haste").

Here, Ibarra received considerably more before Martin suspended him than either Homar or Chaney did. On June 19, Haywood and Sterling discussed the Rolewicz incident with Ibarra and, upon their request, he provided his version of the event to them. Ibarra himself admitted that they told him that Rolewicz was filing charges against him. The fact that Haywood and Sterling did not review the Department's evidence in any more detail at that point, and did not spell out the potential disciplinary consequences in detail, is unimportant, particularly in light of his second presuspension meeting on June 27. Ibarra claims that the Department officials again did not inform him of the charges or evidence against him, or of the disciplinary consequences of Rolewicz's allegations. Yet it is obvious that Ibarra knew that Rolewicz herself was the complaining party, that the impetus behind the series of meetings lay in her allegations about the night of June 16–17, and that the Department was aware of the pending criminal charges. He himself made the latter point clear, when he chose to invoke his Fifth Amendment privilege not to respond to Wisniewski's questions. See also *Panozzo v. Rhoads*, 905 F.2d 135, 139 (7th Cir.1990) (where employee had been notified of the charges against him, "[t]he circumstances surrounding these violations [of rules] were themselves a sufficient explanation of the Village's evidence against him."). Finally, Martin herself informed Ibarra of her reasons for placing him on temporary suspension. This was enough-indeed, given Gilbert arguably more than enough—to protect Ibarra's interest in avoiding an erroneous deprivation.

We note finally that the July 26 hearing would be important only if we agreed with Ibarra that he received the functional equivalent of nothing prior to his suspension. It could be quite important, however, as the kind of prompt postsuspension hearing the *Gilbert* Court appeared to contemplate. The hearing appears to have been designed to meet the *Loudermill* requirements for a pre-

termination hearing. Termination was still a possibility at that point, even though Ibarra had been acquitted in the criminal trial. It hardly bears mentioning that a judge's decision that the prosecution cannot prove criminal misconduct beyond a reasonable doubt does not necessarily mean that an administrative agency would be barred from concluding that it is more likely than not that the misconduct occurred. In fact, of course, the pretermination hearing had exactly the effect that Ibarra would have hoped, which justifies the time and expense of such hearings. Martin decided that she would *not* terminate Ibarra; he was reinstated with full back pay and seniority and the investigation was closed. We realize that the practical consequences of the suspension were difficult for Ibarra, and that in a certain sense money paid later is not the same as an uninterrupted flow of income. But *Gilbert* has resolved that point against Ibarra and makes it clear that no violation of due process occurred in these circumstances.

B. *Equal Protection*

On this count, Ibarra wants injunctive relief against Martin in her official capacity and damages against her in her individual capacity. He claims the record indicates that Martin intentionally discriminated against him pursuant to a Department policy "of disciplining Hispanic males more onerously than non-Hispanic and female employees for equivalent or worse conduct." The district court found that Ibarra had failed to establish a crucial element of his *prima facie* case, namely, that other similarly situated employees of different ethnic origin were treated more favorably than he. We agree that Ibarra had no direct evidence of discrimination, *cf.* *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994), and thus that he had to prove intentional discrimination circumstantially. *See Helland v. South Bend Community School Corp.*, 93 F.3d 327, 329 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997) (§ 1983 discrimination claims, like Title VII claims, may be proven either directly or under the *McDonnell Douglas* framework); *Pilditch v. Board of Education of Chicago*, 3 F.3d 1113, 1116 (7th Cir.1993) (same).

Ibarra's first effort to prove discrimination proceeds by what he calls the "mosaic" method, *see Troupe*, 20 F.3d at 737, under which he has assembled circumstantial evidence that he claims would allow a jury to infer discriminatory intent. His evidence includes the following: (1) statistics that allegedly demonstrate a pattern of discriminatory practice in hiring, promotions, and firing; (2) allegations that Martin routinely discussed and considered race in her personnel decisions; and (3) anecdotal examples of individuals who allegedly were treated better than Ibarra was, because of their race.

■ Closer examination of his proffered evidence reveals, as the district court found, that it does not do the job. Ibarra's "statistics" showed that Hispanics constitute no more than six percent of the Department's workforce, and that at the time Ibarra filed this suit no one in certain management positions was Hispanic. What he does not show, which is essential for these numbers to mean anything, is the baseline against which these numbers should be measured. The record does not indicate how many Hispanics applied to the Department as a whole, or applied for management positions, and of those how many were qualified for the positions in question. Without this basis of comparison, the numbers he offers tell us nothing about the presence or absence of discriminatory practices, *see, e.g., McNamara v. City of Chicago*, 1998 WL 117894 (7th Cir. Mar.18, 1998), even assuming discrimination in hiring could be used as evidence of discrimination in suspending or otherwise disciplining employees. Furthermore, we note that Ibarra points to the lack of Hispanics on the "Executive Staff" or serving as "Deputy Chiefs," but he fails to acknowledge that 6% of the "Administration" and 7% of "Supervisors" were Hispanic.

■ With respect to terminations, Ibarra's evidence indicates that Martin terminated five Hispanics between July 1991 and May 1996, which amounted to 15% of her 33 dismissals. Playing with numbers, this can be described as 153% more than would be expected, given that only 6% of the agency is Hispanic. (Ibarra claims this is 217% more

than would be expected, but his math seems lacking here.) But in terms of real people, this is just a dramatic way of saying Martin terminated five Hispanics instead of approximately two—a pool far too small for the percentage descriptions to mean anything. Ibarra also attempted to include another dismissal, that of Sherry Estrada, as evidence of discrimination against Hispanics, but the record shows that Estrada identified herself as Black. In addition, the district court pointed out that two of the five who Martin allegedly terminated "impliedly resigned." If we exclude those two (and other non-Hispanics whose termination is also recorded as an "implied resignation") from Ibarra's statistics, the calculation produces a termination rate for Hispanics of 11% (3 of 27), which is not statistically different from a hypothetical 6% termination rate given the size of the pool, and is not enough to support an inference of intentional discrimination.

■ The allegation about Martin's consideration of race in her personnel decisions is supported only by an affidavit from Martin's former Administrative Assistant reporting that Martin often expressed her desire to promote a Black to the next available supervisory position and her objections to hiring White candidates that the Chief Judge's office sent her way. First, this is plainly inadmissible hearsay. Second, it has nothing to do with Martin's general administration of discipline in the Department. Third, the affidavit has only the remotest relevance to Martin's attitude toward Hispanics or the way she disciplined that group. Either alone or with the "statistics," this was not enough to raise a jury issue either.

■ Last, Ibarra compares his treatment to that of several "comparable" employees and concludes that only his race can explain the difference. But, as the district court observed, his "comparables" were not in fact similarly situated to him, *cf. Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1405–06 (7th Cir.1996), and thus do not add tiles to the mosaic showing discrimination Ibarra is attempting to construct. Ibarra points to Clyde Cobb, who was charged with domestic violence; Clyde Akbar, who allegedly harbored a fugitive; Joseph Buford and Bryan Rich, who were accused of stealing from second jobs; Geoffrey Holliman, who allegedly engaged in a fist fight with a female subordinate; Grady Humphrey, who allegedly sexually harassed another employee; and Bruce Johnson, who allegedly assaulted a superior. Finally, he alleges that Richard Clark was repeatedly intoxicated on the job, and that Connie Williams systematically discriminated against non-Black probation officers in her unit.

The first set of "comparables" Ibarra points to is no such thing, for the simple yet crucial reason that their alleged misconduct did not involve fellow employees. A supervisor could very reasonably believe that misconduct involving other current employees would create a sufficiently increased chance of workplace disruption to warrant suspending the alleged miscreant. Furthermore, Martin eventually suspended Cobb in April 1996, after she learned about various charges against him; Akbar was found not guilty of the crimes he was charged with (the record does not show whether he was suspended during their pendency); and Martin dismissed Buford after he was convicted of theft.

Of the remaining employees, Clark and Williams are far afield from Ibarra's case, because their alleged misdeeds did not involve any claim of violent behavior. Humphrey and Johnson appear to be closest to Ibarra in terms of their alleged misconduct, but the record indicates that they were both reprimanded and suspended. Since Ibarra was never even formally reprimanded, it is hard to see how his treatment was *worse* than theirs. This leaves Holliman and his alleged fistfight with the female subordinate. Although this is obviously not commendable behavior, Martin could reasonably have regarded a fistfight as different in kind from alleged sexual misconduct. Also, of course, the fistfight did not lead to criminal charges, which is a second crucial difference. (We note that the record includes only sparse information, and even sparser analysis, on several of these alleged incidents, including this one. Furthermore—as the district court noted—much of the information that is in the record is inadmissible hearsay.) Ibarra's

"comparables," either alone or in combination with his statistical evidence, are not enough to allow a jury to infer discriminatory intent.

For the same reasons that Ibarra fails to prove discrimination using the *Troupe* "mosaic" method of circumstantial evidence, he fails to make the prima facie case required under the approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As we pointed out in *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1398 (7th Cir.1997), it is essential in these cases to be able to point to at least one similarly situated employee who has been treated more favorably than the plaintiff. *See also McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993) (§ 1983). Ibarra has not done so, and his equal protection claim therefore cannot succeed.

We therefore AFFIRM the judgment of the district court.