# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-3309

_____

Craig P. Wallin,                                          *
                                                         *
            Appellant,                                   *
                                                         *
    v.                                                   *
                                                         *
Minnesota Department of Corrections;                     *
Dennis Benson, individually and in his                   *
official capacity as Chief Executive                     *
Officer (Warden) of the Minnesota                        *   Appeals from the United States
Correctional Facility at Stillwater; David *   District Court for the
Corbo, individually and in his official                  *   District of Minnesota.
capacity as Personnel Director and                       *
Associate Warden; Elizabeth A. Binkley, *
individually and in her official capacity                *
as a Correctional Officer; John & Jane                   *
Does, individually and in their official                 *
capacities as Correctional Officers at the *
Minnesota Correctional Facility                          *
at Stillwater; Terry Bath, individually                  *
and in his official capacity as a                        *
Correctional Officer,                                    *
                                                         *
            Appellees.                                   *

_____

No. 97-3956
_____

Craig P. Wallin,                                    *
                                                    *
            Appellant,                              *
                                                    *
      v.                                            *
                                                    *
Minnesota Department of Corrections;                *
Dennis Benson, individually and in his              *
official capacity as Chief Executive                *
Officer (Warden) of the Minnesota                   *
Correctional Facility at Stillwater; David          *
Corbo, individually and in his official             *
capacity as Personnel Director and                  *
Associate Warden; Elizabeth A. Binkley,             *
individually and in her official capacity           *
as a Correctional Officer; John Doe,                *
individually and in their official                  *
capacity as Correctional Officer at the             *
Minnesota Correctional Facility at                  *
Stillwater; Jane Doe, individually and in           *
their official capacity as Correctional             *
Officer at the Minnesota Correctional               *
Facility at Stillwater; Terry Bath,                 *
individually and in his official capacity           *
as a Correctional Officer,                          *
                                                    *
            Appellees.                              *

_____

Submitted: June 12, 1998
Filed: August 17, 1998

_____

Before BEAM, ROSS, and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

Craig Wallin was twice discharged from his position as a corrections officer at the Minnesota Correctional Facility at Stillwater (MCF-Stillwater) and twice reinstated after grievance proceedings. After his second discharge and subsequent reinstatement, Wallin sued the Minnesota Department of Corrections, warden David Benson, human resources director David Corbo, and coworkers Terry Bath and Elizabeth Hughes, claiming they discriminated against him on the basis of his disabilities of alcoholism and depression in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213, and failed to provide him due process or equal protection of the laws in connection with his terminations. The district court granted summary judgment in favor of the defendants, and Wallin appeals. We affirm.

**I.**

Wallin began working as a corrections officer at MCF-Stillwater in 1980. Eleven years later, in 1991, Wallin was diagnosed with depression and, in July 1991, MCF-Stillwater gave Wallin two weeks of leave on account of his depression. According to Wallin, after he returned, coworker Bath said: "'I think I'm going to get ahold of a psych so I can get a week off work. I understand that's how you got time off.'" Wallin Dep. (Mar. 6, 1996) at 80-81, reprinted in J.A. at 87-88. Wallin also noticed that someone had drawn pictures on his calendar on each of the days he was absent from work that appeared to be psychiatrist beds. Wallin reported the bed incident, but not Bath's comment, to his supervisor. It was around this time that Wallin began abusing alcohol.

In March 1992, Wallin was arrested and charged with assaulting his girlfriend. Pending trial, MCF-Stillwater permitted Wallin to return to work if he completed a chemical dependency program and remained chemical-free for three years. In August 1992, Wallin pled guilty to one count of gross misdemeanor assault in connection with the assault and received a fifteen-day workhouse sentence. On August 25, 1992, MCF-Stillwater discharged Wallin because of the conviction.

Wallin's union, the American Federation of State, County, and Municipal Employees (AFSCME), represented Wallin in grievance proceedings under the collective bargaining agreement (CBA) covering Wallin's employment. The grievance proceedings resulted in a settlement between AFSCME and MCF-Stillwater that reinstated Wallin with a demotion of one rank, but without reducing his pay (Settlement Agreement). The Settlement Agreement, dated December 11, 1992, settled all claims between the parties.[1] AFSCME and MCF-Stillwater signed the agreement, and Wallin acknowledged that he "underst[oo]d and voluntarily accept[ed] the terms of this Settlement." Settlement Agreement (Dec. 11, 1992) at 2, reprinted in J.A. at 26.

---

[1]The relevant section of the Settlement Agreement reads as follows:

> The parties agree that this Settlement and Release is made for the purpose of releasing and discharging each other (including their employees, agents, officers and officials jointly and severally, individually and in their official capacities) by compromising and finally settling all claims, differences, grievances and causes of action against the above-noted parties based on any and all acts or omissions allegedly committed by them, including but not limited to, claims based upon contract, employment agreement, violation of statutory law, violation of civil or constitutional right, or tortuous conduct arising from or in any way connected with the parties' employment relationships, up to and including the date of this Settlement and Release.

Settlement Agreement (Dec. 11, 1992) at 1, reprinted in J.A. at 25 (emphasis added).

After Wallin returned to work in January 1993, he claims he was subjected to discrimination when, on January 31, 1993, he overheard coworker Bath say the following to another employee: "It's just like these alcoholic fuckers that--around here that go to treatment, go serve a jail sentence, and the institution allows them to come back; this is a bunch of bullshit." Bath Dep. (Feb. 7, 1997) at 40, reprinted in J.A. at 3172. Bath later apologized for this comment, and received a verbal reprimand after MCF-Stillwater investigated the incident. In the spring of 1993, Wallin requested to be transferred to certain other prison facilities, but never suggested that a transfer was necessary to accommodate his disabilities. In fact, there is no evidence that Wallin gave any reason for requesting the transfers. His requests were denied by the transferee prisons.

In late March, Wallin began a dangerous pattern of misconduct and misbehavior. On March 28, 1993, Wallin administered an overly aggressive and unusually lengthy shakedown of an inmate even though a fellow officer could not discern the inmate doing anything wrong. Wallin smiled and told the fellow officer that that was how a shakedown was done. On April 3, 1993, Wallin intentionally left the cell doors in an entire cell block unbolted, creating a security breach. In a memo admitting to the incident, Wallin would not admit that what he had done was wrong, instead explaining that he sought to test a fellow officer who was assigned to check Wallin's work. Wallin would not assure MCF-Stillwater that such unauthorized conduct would not be repeated, instead saying that "it more than likely won't happen again." Wallin Mem. (Apr. 4, 1993), reprinted in J.A. at 2394. On April 20, 1993, Wallin threatened coworker Hughes in front of inmates, while the two were alone doing a nighttime check of the cells. Wallin became very agitated, held the keys needed to get through a gate, backed Hughes up against a railing, cornering her, and refused to give her the key she needed to get through the gate. According to Hughes, Wallin told her: "'Don't you be telling me what to do . . . . You really think you're something around here but you ain't shit.'" Hughes Interview (Apr. 21, 1993) at 4, reprinted in J.A. at 2358. Wallin finally opened the door, saying that he did not care if she reported him.

Thereafter, Wallin was interviewed regarding the security breach, the shakedown, and the Hughes incident. Wallin would not admit to much of what others claimed he had done, and often claimed that he could not remember important details. Wallin was suspended without pay pending further investigation.[2] On April 30, 1993, at a meeting between Wallin, Benson, Corbo, Wallin's attorney, and Wallin's union representative, Wallin was terminated. At the meeting, Wallin explained that he was having problems with his medication. Wallin received a termination letter at the meeting that explained that Wallin's termination was due to the three above-described incidents, along with numerous other minor incidents of misconduct.

AFSCME again represented Wallin in a grievance challenging his termination. The grievance was submitted to arbitration. An arbitrator concluded that the security breach and shakedown warranted discipline, but that the incident between Wallin and Hughes was not harassment and did not constitute punishable wrongdoing. According to the arbitrator, the two incidents of misconduct were not extreme and did not constitute just cause for terminating Wallin. Therefore, the arbitrator ordered that Wallin be reinstated, and that the period between Wallin's termination and his reinstatement be treated as an unpaid disciplinary suspension. The discharge letter remained in his file, but was renamed a "suspension" letter.

On November 11, 1993, while the arbitration was pending, Wallin filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), charging that he was the subject of disability discrimination between January 14, 1993 and April 30, 1993. On August 3, 1995, the EEOC issued a right to sue letter.

Wallin then filed the instant suit, claiming that MCF-Stillwater violated the ADA

---

[2]The CBA specifically permitted "an investigatory suspension without pay provided a reasonable basis exists to warrant such suspension." CBA at 48, reprinted in J.A. at 1190. The CBA limited such an unpaid suspension to five days.

under a variety of theories. Wallin also claimed, under 28 U.S.C. § 1983, that Benson, Corbo, Hughes, and Bath denied him due process and equal protection of the laws. The district court granted summary judgment in favor of the defendants on all of Wallin's claims. The district court also awarded partial attorneys' fees of $330.67 to the defendants. Wallin appeals the district court's grant of summary judgment.[3]

## II.

We review the district court's grant of summary judgment de novo. Miners v. Cargill Communications, Inc., 113 F.3d 820, 822 (8th Cir.), cert. denied, 118 S. Ct. 441 (1997). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether the moving party is entitled to summary judgment, we "resolve all controversies in favor of the non-moving party, take the non-movant's evidence as true, and draw all justifiable inferences in favor of that party." Miners, 113 F.3d at 823. However, "the non-movant may not rest on allegations or denials in its pleadings but must 'set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

## A.

Wallin first claims that MCF-Stillwater violated the ADA by terminating him in 1993 because of his alcoholism and depression.

To establish a prima facie case under the ADA, a plaintiff must show [1] that she was a disabled person within the meaning of the ADA, [2] that

---

[3]Wallin also appeals the award of attorneys' fees. Because the district court did not abuse its discretion, we affirm. See Warner v. Independent Sch. Dist. No. 625, 134 F.3d 1333, 1336 (8th Cir. 1998) (standard of review).

she was qualified to perform the essential functions of the job, and [3] that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

Miners, 113 F.3d at 823.

Proceeding directly to the third element of Wallin's prima facie case under the ADA,[4] Wallin is required to come forward with evidence that his firing occurred in circumstances that could give rise to an inference of discrimination. That happens when "one can infer . . . that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under [federal law].'" Furnco Constr. Corp. v. Waters, 438 U.S. 567, 576 (1978) (Title VII) (quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)). One common way to raise an inference is to prove disparate treatment "by showing that [plaintiff] was treated less favorably than similarly situated

---

[4]As to the first element of the prima facie case, we doubt that Wallin has come forward with evidence that his alcoholism impaired a major life activity, see 42 U.S.C. § 12102(2)(A), because he was chemical free for one year prior to the period of alleged discrimination (and for two years after), and has presented no evidence showing that his major life activities were impaired. See Burch v. Coca Cola Co., 119 F.3d 305, 315-16 (5th Cir. 1997) (there must be an individualized showing that alcoholic plaintiff suffered permanent impairment, and evidence that alcoholics, in general, are impaired is inadequate), cert. denied, 118 S. Ct. 871 (1998). We also find the evidence of Wallin's depression to be sparse. Nonetheless, we need not definitively resolve those issues, and we need not determine whether MCF-Stillwater regarded Wallin as having those disabilities, see 42 U.S.C. § 12102(2)(C); Miners v. Cargill Communications, Inc., 113 F.3d 820, 823 (8th Cir.) (plaintiff is regarded as an alcoholic when she is "offered . . . the choice between entering a chemical-abuse treatment program or being fired"), cert. denied, 118 S. Ct. 441 (1997), if Wallin failed to establish the third element of his prima facie case. See Weber v. American Express Co., 994 F.2d 513, 515-16 (8th Cir. 1993) (plaintiff must establish factual dispute as to each element of prima facie case). As to the second element of the prima facie case, MCF-Stillwater admits that Wallin was qualified.

employees who are not in plaintiff's protected class." Johnson v. Legal Servs. of Ark., Inc., 813 F.2d 893, 896 (8th Cir. 1987) (racial and disability discrimination). Employees are similarly situated when they "are involved in or accused of the same or similar conduct and are disciplined in different ways." Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir. 1994).

Wallin argues that similarly situated employees were disciplined differently. Having examined the undisputed record, we disagree. The other employees cited by Wallin were not similarly situated to Wallin because their misconduct was not as egregious as Wallin's. Wallin, unlike the other employees, created a substantial public danger by leaving an entire cell block unbolted, and was involved in three serious, unrelated incidents in a short, one-month period while demonstrating a pattern of violent behavior. Additionally, Wallin, unlike the other employees, was evasive during investigation of the misconduct, would not admit to wrongdoing, and could not assure supervisors that he would not repeat his misdeeds.

No other evidence raises an inference of discrimination. The only event with any discriminatory implications was coworker Bath's statement that Wallin was an "alcoholic fucker." However, MCF-Stillwater showed that it would not tolerate such conduct when it promptly investigated the incident and reprimanded Bath. Thus, rather than allowing one to infer discrimination, MCF-Stillwater's prompt response gives rise to the opposite inference.

Nor will we infer discrimination simply because the arbitrator reinstated Wallin; instead, the reinstatement suggests only that, in the arbitrator's eye, MCF-Stillwater overreacted to Wallin's misconduct. See Johnson, 813 F.2d at 896 (personnel "[d]isputes generally arise out of mutual misunderstanding, misinterpretation and overreaction, and without more, such disputes do not give rise to an inference of discrimination"). Thus, Wallin has come up with no evidence that can give rise to even

a thin inference of discrimination in his firing, and his prima facie case must fail. [5]

**B.**

Wallin next argues that when he returned to work in 1993, his work environment was hostile. This Court has never recognized an ADA claim based on a hostile work environment, though other courts have done so. See, e.g. Keever v. City of Middletown, 1998 WL 271190, at *5 (6th Cir. May 29, 1998). We will assume, without deciding, that such a cause of action exists, and that "it would be modeled after the similar claim under Title VII." McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1997) (per curiam). To be actionable under Title VII, harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)) (alteration in original). Because the discrimination laws are not a "general civility code," "offhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. at 2283-84 (quotations omitted). Accordingly, "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing" are not actionable. Id. at 2284 (quotations omitted).

Wallin points to numerous incidents of friction between himself and his coworkers, but provides no evidence that this workplace friction was due to his

---

[5]Wallin also claims his discharge violated the Equal Protection Clause of the Fourteenth Amendment. Because Wallin has not come forward with any evidence that would permit the inference that he was treated differently because of his disability, his equal protection claim must also fail. See Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994) ("[T]he first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her.").

disabilities. See Smith v. St. Louis Univ., 109 F.3d 1261, 1264 (8th Cir. 1997) (to prevail on hostile work environment claim under Title VII, plaintiff must prove "that the harassment was based on sex"). The only three incidents that related to Wallin's disabilities--Bath's suggestion that seeing a psychologist was a good method to obtain vacation time, the drawings on Wallin's calender,[6] and Bath's reference to Wallin as an "alcoholic fucker" in January 1993--are isolated incidents that are not sufficiently severe or pervasive to affect the terms or conditions of Wallin's employment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (look to "frequency of the discriminatory conduct," among other things, to determine if work environment is hostile). Thus, Wallin's hostile work environment claim must fail.[7]

## C.

Wallin next argues that his 1993 discharge was in retaliation for making internal discrimination complaints. However, Wallin failed to allege retaliation in his EEOC Charge of Discrimination. "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and

---

[6]These first two incidents occurred in July 1991, a year and a half before the period during which Wallin claims his work environment became hostile, and prior to the effective date of the ADA. See Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 108, 104 Stat. 327, 337 (effective two years after its July 26, 1990 date of enactment).

[7]Moreover, Wallin felt comfortable reporting the "alcoholic fuckers" incident under MCF-Stillwater's harassment reporting procedures, and MCF-Stillwater quickly and thoroughly investigated the incident, ultimately reprimanding Bath. Neither Bath nor Wallin's other coworkers have engaged in any such conduct since that reprimand. Cf. Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2292 (1998) (employer can avoid liability for supervisor's harassment by "provid[ing] a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense").

-11-

conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994) (quotations omitted). Although "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC," id. at 222, it is well established that retaliation claims are not reasonably related to underlying discrimination claims. See, e.g., id. at 223 (plaintiff's "claims of race discrimination are separate and distinct from her claims of retaliation"). Thus, Wallin's retaliation claim will not be considered unless it "grew out of the discrimination charge he filed with the EEOC." Wentz v. Maryland Cas. Co., 869 F.2d 1153, 1154 (8th Cir. 1989) (district court may hear retaliation claim when plaintiff is retaliated against for filing the EEOC charge that alleged only discrimination).

The retaliation Wallin alleges was not the result of his filing of the EEOC charge. Indeed, the retaliation alleged by Wallin occurred at the same time as the alleged discrimination, long before he filed a charge of discrimination with the EEOC. Because Wallin did not allege retaliation in his EEOC charge, we need not consider this claim.

**D.**

Next, Wallin argues that MCF-Stillwater violated the ADA when it failed to reasonably accommodate his disabilities by transferring him to a different prison facility where he would not be harassed. We disagree.

In general, "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. app. § 1630.9 (1992).

> Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is

-12-

> often the case when mental disabilities are involved, <u>the initial burden rests primarily upon the employee</u> . . . <u>to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations</u>.

<u>Taylor v. Principal Fin. Group, Inc.</u>, 93 F.3d 155, 165 (5th Cir.) (emphasis added), <u>cert. denied</u>, 117 S. Ct. 586 (1996).

Here, Wallin requested transfers, but made no connection between these requests and his disabilities. Thus, MCF-Stillwater had no reason to think that the transfers were requested as accommodation for his disabilities. <u>See</u> <u>Beck v. University of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1136 (7th Cir. 1996) (when only one party knows what type of accommodation is required, that party is responsible for disclosing the relevant information). Additionally, it is unlikely that the accommodation Wallin now claims to have sought was reasonable. <u>See</u> <u>Gaul v. Lucent Tech., Inc.</u>, 134 F.3d 576, 579, 581 (3d Cir. 1998) (employee's accommodation "request to be transferred away from individuals causing him prolonged and inordinate stress" was "amorphous" and unreasonable as a matter of law).

## III.

Wallin next argues that his 1992 termination violated the Due Process Clause. As a threshold matter, we must determine whether Wallin waived constitutional claims stemming from events occurring prior to his signing the December 1992 Settlement Agreement. Wallin, supported by the EEOC as amicus, argues that because AFSCME was only authorized to negotiate Wallin's claims under the CBA, it was beyond AFSCME's authority to negotiate away Wallin's constitutional claims in the Settlement Agreement. We disagree.

The CBA, which only provided for arbitration of disputes over application of the CBA, did not authorize an arbitrator to resolve Wallin's statutory and constitutional claims. <u>Cf.</u> <u>Patterson v. Tenet Healthcare, Inc.</u>, 113 F.3d 832, 837 (8th Cir. 1997)

(statutory discrimination claims may be resolved in mandatory arbitration where the arbitration agreement "does not limit the arbitrator solely to interpretation of the [employment] contract").  Nonetheless, nothing would have prevented Wallin from waiving those claims, as long as his "consent to the settlement was voluntary and knowing."  Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.15 (1974); see id. at 52 ("Although presumably an employee may waive his cause of action under Title VII as a part of a voluntary settlement, mere resort to the arbitral forum to enforce contractual rights constitutes no such waiver." (footnote omitted) (emphasis added)).

Wallin understood and consented to a waiver of all pre-settlement claims.  See Settlement Agreement at 1-2 (Wallin "understand[s] and voluntarily accept[s] the terms" of the settlement, which provides that the parties release each other from "claims based upon . . . violation of civil or constitutional right."), reprinted in J.A. at 25-26.[8] Moreover, Wallin's personal attorney reviewed the Settlement Agreement and signed off on its terms.  See Lyght v. Ford Motor Co., 643 F.2d 435, 440 (6th Cir. 1981) ("In determining that the settlement was voluntarily and knowingly made the court specifically noted that the plaintiff was represented by counsel at the time the last settlement was reached and accepted.").  Thus, we hold as a matter of law that Wallin voluntarily waived all pre-settlement constitutional claims.

---

[8]The EEOC argues that because the Settlement Agreement does not "refer to any specific federal statute," it does not comprise a waiver of rights under § 1983.  Br. of EEOC at 11.  This argument is meritless.  See Pilon v. University of Minn., 710 F.2d 466, 467-68 (8th Cir. 1983) (even though settlement does not specifically mention release of Title VII claim, "the wording of the release in the present case is clear and leaves no doubt that all claims potentially held by Pilon are waived" (emphasis added)).  Wallin's Settlement Agreement similarly waived all pre-settlement constitutional claims.

IV.

Wallin also raises due process claims in connection with his 1993 termination, which we address in turn.

**A.**

Wallin first argues that he received an inadequate hearing, under Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), prior to his termination in 1993. We disagree. When a state employee may be terminated only for cause, Loudermill requires that the employee receive a pretermination hearing as "an initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46. The April 30, 1993 meeting with Benson and Corbo provided Wallin all the process he was due. Namely, Wallin received "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. at 546. Thus, Wallin's claim must fail.[9]

---

[9]We also reject Wallin's claim that he was deprived of liberty without due process when stigmatizing statements were made in his termination letter. Wallin's Loudermill hearing on April 30, 1993 was all the process he was due in connection with those stigmatizing statements. See Nelson v. City of McGehee, 876 F.2d 56, 58 (8th Cir. 1989). Wallin also claims that his liberty interest was deprived without due process when his termination letter was renamed a "suspension" letter and returned to his employment file upon his reinstatement. Because Wallin was not terminated in conjunction with this alleged defamation, but was reinstated, no liberty interest was deprived by the letter. Cf. Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630 (2d Cir. 1996) ("a defamatory statement about an employee implicates a liberty interest when it is made during the course of that employee's termination from employment"), cert. denied, 117 S. Ct. 1083 (1997); Brayman v. United States, 96 F.3d 1061, 1066 (8th Cir. 1996) (per curiam) ("[I]t is well established that defamation or injury to reputation by itself does not state a constitutional deprivation.").

**B.**

Wallin next argues that Benson and Corbo deprived him of property without due process when they suspended him for five days without pay prior to his pretermination hearing. This Court has held that a <u>Loudermill</u> hearing is required prior to the "suspension of a public employee who has a property interest in retaining the job." <u>Bartlett v. Fisher</u>, 972 F.2d 911, 915 (8th Cir. 1992). We are unsure whether the state intended to create a property interest in avoiding an unpaid suspension when it agreed in the CBA that an employee could only be suspended without pay if "a reasonable basis exists to warrant such suspension." CBA at 48, <u>reprinted in</u> J.A. at 1190. However, we need not decide this issue because even if a property interest was created by the CBA's suspension provision, Wallin received all the process he was due prior to his suspension.

To determine what process is due, we balance three factors: first, "the private interest that will be affected by the official action;" second, "the Government's interest;" and third, "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." <u>Matthews v. Eldridge</u>, 424 U.S. 319, 335 (1976). Wallin's private interest in uninterrupted income is minimal because the unpaid suspension was limited to five days, he retained his benefits, and a <u>Loudermill</u> hearing was provided shortly after his suspension. <u>See</u> <u>Gilbert v. Homar</u>, 117 S. Ct. 1807, 1813 (1997) ("Unlike the employee in <u>Loudermill</u>, who faced <u>termination</u>, respondent faced only a <u>temporary suspension</u> without pay. So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all." (citations omitted)); <u>Winegar v. Des Moines Indep. Community Sch. Dist.</u>, 20 F.3d 895, 899 n.5 (8th Cir. 1994) (while the length and severity of a

-16-

suspension is not determinative of whether a property right exists, "they are factors to weigh in determining the appropriate form of hearing").

The state's interest in taking every precaution to preserve a safe prison environment, on the other hand, is substantial. This concern is heightened when the behavior alleged, if it continued, would endanger prisoners, prison employees, and the general public. Wallin's behavior created precisely those risks.

Finally, we "look more closely at the procedures [Wallin] actually received, to see if they adequately protected him against the risk of an erroneous deprivation of his interest in not being suspended from his job." Ibarra v. Martin, 143 F.3d 286, 290 (7th Cir. 1998). Here, Wallin was interviewed regarding each incident prior to his suspension. Thus, Wallin both had notice of the charges against him and had an initial opportunity to present his side of the story, making the likelihood of error minimal. See id. (presuspension procedures adequate when plaintiff was interviewed concerning incident); Chaney v. Suburban Bus Div. of Reg'l Transp. Auth., 52 F.3d 623, 628 (7th Cir. 1995) (Chaney's "interest in avoiding a suspension is significant. Nonetheless, Chaney was on notice as to why he was being suspended and [the state employer's] interest in both managerial efficiency and in public safety clearly outweigh Chaney's interest in a pre-suspension hearing. The Constitution does not mandate additional protections at this stage."). Finally, Wallin received a Loudermill hearing soon after his suspension, exactly "the kind of prompt postsuspension hearing the Gilbert Court appeared to contemplate." Ibarra, 143 F.3d at 290. Because the risk of error was small and the prison's need to take every precaution to preserve safety was substantial, we conclude that Wallin received his due process prior to the investigatory suspension.[10]

_____

[10]Wallin's claim that the defendants conspired to violate his constitutional rights in violation of 28 U.S.C. § 1985 is meritless, and does not warrant further discussion. See 8th Cir. R. 47B.

## V.

For the foregoing reasons, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.